JAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Samuel Denk,<br><br>Plaintiff,<br><br>v.<br><br>City of Peoria, et al.,<br><br>Defendants. | No. CV-20-00818-PHX-ROS (ASB)<br><br>**ORDER** |

Plaintiff Samuel Denk, who is represented by counsel, brought this civil rights action pursuant to 42 U.S.C. § 1983. Defendants City of Peoria, Chief of Police Arthur Miller, Sergeant Matthew Miller, and Jane Doe Miller move for summary judgment. (Doc. 55.) The Motion is fully briefed. (Doc. 63, 69). Defendants have also filed a Motion to Exclude the Testimony and Opinions of Timothy Woods. (Doc. 54.) The Motion is fully briefed. (Doc. 67, 71.)

The Court will deny the Motion to Exclude and will grant in part and deny in part the Motion for Summary Judgment.

**I.    Background**

As relevant here, in the First Amended Complaint, Plaintiff asserts claims arising from his March 27, 2019 arrest, in the course of which he was allegedly shot by Defendant Matthew Miller. (Doc. 8 at 3, 7-20.) Plaintiff alleges in Count Two that Defendant City of Peoria was grossly negligent in connection with the actions surrounding Plaintiff's arrest. (Doc. 8 at 7-12.) In Count Three, Plaintiff asserts that Defendant Arthur Miller, in

his official capacity, violated Plaintiff's rights by failing to properly screen, hire, train, retain, and supervise City of Peoria police officers. Plaintiff further alleges that Defendant City of Peoria violated his rights based on its policies and customs relating to the screening, hiring, training, retention, and supervision of City of Peoria police officers. In Count Four, Plaintiff asserts a claim for unlawful search and seizure against Defendant Matthew Miller, and in Count Five, Plaintiff asserts an excessive force claim against Defendant Matthew Miller. (*Id.* at 12-17.)

**II.      Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co.*, *Ltd. v. Fritz Co.*, *Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and

determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.  Motion to Exclude

Defendants move to exclude the testimony and opinions of Plaintiff's expert witness, Timothy Woods. (Doc. 54.) In ruling on the Motion for Summary Judgment, the Court did not rely on the opinions of Mr. Woods. The Court will therefore deny Defendants' Motion to Exclude. The parties may more appropriately raise these issues in motions in limine in the event there is a trial in this matter.

### IV.  Abandonment of Claims

In their Motion, Defendants assert that Plaintiff has abandoned his gross negligence claim against the City of Peoria in Count Two, his § 1983 supervisory liability claim against Arthur Miller in Count Three, and his § 1983 unlawful search and seizure claim against Matthew Miller in Count Four. (Doc. 55 at 4.) Defendants contend that Plaintiff has developed no evidence at all regarding the screening, hiring, training, retaining, or supervision of Peoria police officers as it pertains to either Arthur Miller as Chief of Police or Peoria. (*Id.*) Defendants argue that Plaintiff did not serve the City of Peoria with any written discovery on these claims; did not depose Chief Arthur Miller or anyone else who has knowledge of the City of Peoria's screening, hiring, training, retention, or supervision policies; and has disclosed no expert to opine on any of those topics. (*Id.*)

In his Response, Plaintiff does not respond to Defendants' arguments regarding Counts One through Four. (Doc. 63.) The Court will therefore grant Defendants' Motion for Summary Judgment as to Counts Two through Four and will dismiss Defendants City of Peoria and Arthur Miller.

. . . .

. . . .

. . . .

V.  **Excessive Force**

    A.  **Facts**

        1.  **Undisputed Facts**

On March 27, 2019, at approximately 10:45 p.m., Defendant Matthew Miller (Sergeant Miller) saw a white Jeep driving with no taillights. (Pl.'s Controverting Statement of Facts (PCSOF), Doc. 64 at 1 ¶¶ 1-2.) Sergeant Miller pulled the vehicle over for a traffic stop. (*Id.* ¶ 3.) As he approached the Jeep, Sergeant Miller saw that the driver's side window was rolled down. (*Id.* ¶ 4.) Sergeant Miller also observed Plaintiff moving around in the vehicle. (*Id.* ¶ 5.) As he arrived next to the Jeep, Sergeant Miller could see that Plaintiff had his left arm up on the window and his right arm down in his lap on his right leg. (*Id.* ¶ 6.)

As Sergeant Miller started to explain the reason for the traffic stop, he noticed a black semiautomatic handgun between Plaintiff's legs, along with a pipe that is commonly used to smoke illegal drugs, such as methamphetamines. (*Id.* ¶ 7.) At that point, Sergeant Miller pulled his department issued service weapon. (*Id.* ¶ 8.) Sergeant Miller ordered Plaintiff to put both hands on the steering wheel. (*Id.* ¶ 11.) Sergeant Miller fired one round from his police department issued handgun, which struck Plaintiff. (*Id.* ¶ 16.)

        2.  **Plaintiff's Facts**

When Sergeant Miller pulled his service weapon, he pointed it at Plaintiff's face. (*Id.* ¶ 8.) Plaintiff attempted to comply with Sergeant Miller's order to place both hands on the steering wheel, but Sergeant Miller shot Plaintiff before his hands reached the steering wheel. (*Id.* ¶ 12.)

        3.  **Defendants' Facts**

Defendants dispute Plaintiff's version of the facts that led to Sergeant Miller firing his service weapon and hitting Plaintiff. Defendants allege that Sergeant Miller drew his service weapon after he saw a black semiautomatic handgun between Plaintiff's legs and a pipe. (Defs. Statement of Facts (DSOF), Doc. 56 at 2 ¶ 7.) Defendants claim Sergeant Miller did not point his service weapon at Plaintiff. (*Id.* ¶ 8.) Defendants assert that

Plaintiff did not comply with Sergeant Miller's order to put both hands on the steering wheel. (*Id.* ¶ 11.) Defendants contend that Sergeant Miller started to give Plaintiff a second command to put his hands on the steering wheel, and again Plaintiff did not comply, but instead started moving his right hand backwards on his right leg towards "his crotch area." (*Id.* ¶ 13.) Defendants assert that at that point, Sergeant Miller fired one round from his police department issued handgun, which struck Plaintiff. (*Id.* ¶ 16.)

### B.   Video Evidence

Defendants submitted a video containing footage from Sergeant Miller's body-worn camera, which the Court has reviewed. The video shows the following:

The footage begins with Sergeant Miller seated in his patrol vehicle. At the 30-second mark, Sergeant Miller approaches Plaintiff's vehicle and walks to the open driver's side door where Plaintiff was seated. At the 34-second mark, Plaintiff says, "how are you doing." Three seconds later, Miller introduces himself. At the 38-second mark, Miller says to Plaintiff, "Do not reach for that firearm, put your hands on the steering wheel right now." Plaintiff turns his head toward Miller and says, "yes" or "yeah."

At the 42-second mark, Sergeant Miller unholsters his duty weapon and yells, "put your hands on the steering wheel! Put your hands on the…" It is unclear from the video where Plaintiff's hands are. Miller points his duty weapon at Plaintiff's head and shoots Plaintiff in the left side of his face. At the 44-second mark, Miller exclaims, "Shit! God damn it." (DSOF Ex. C).

### C.   Fourth Amendment Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Reasonableness is evaluated "based upon the information the officers had when the conduct occurred." *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017). The reasonableness inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interest against the countervailing governmental interests." *Graham*, 490 U.S. at 395.

To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis, assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect was resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396−97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)). However, the reasonable inquiry "is not limited to these factors. Rather, recognizing that "the facts and circumstances of every excessive force case will vary widely, [the] ultimate inquiry addresses 'whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Young v. County of Los Angeles*, 655 F.3d 1156, 1163 (9th Cir. 2011) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "Ultimately, [courts] must balance the force that was used by the officers against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537.

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20−22 (1968)). This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396−97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. at 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Because the excessive force balancing test is "inherently

fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

### D. Discussion of Video Evidence

Where video evidence is available in an excessive use-of-force case, the Supreme Court has stated that courts "should [] view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380−81. This does not mean that courts no longer take the nonmovant's version of the facts as true where video evidence, seen in a light most favorable to the nonmoving party, leaves room for genuine dispute. Courts must still draw all reasonable inferences in the nonmovant's favor. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citing *Blankenhorn v. City of Orange*, 485 F.3d 463, 468 n.1 (9th Cir. 2007)). The evidence in the record is viewed in the light most favorable to Plaintiff so long as his version of the facts is not blatantly contradicted by the video evidence. *Scott*, 550 U.S. at 378-81.

Defendants largely do not dispute Plaintiff's description of the body-worn camera footage. Defendants contend that Plaintiff "would like this Court to believe" that the footage, "particularly the 'screenshots' he provides and the edited footage he used to depose Sergeant Matthew Miller, tells the whole story and cited extensively to it in his Response and Statement of Facts." (Doc. 69 at 5.) Defendants state that the Court will be able to view the footage for itself and "see what can be seen." (*Id.*) Defendants contend that Plaintiff's gun cannot be seen on the footage," although there is no dispute the gun

was in Plaintiff's lap, "because Sergeant Miller's body-worn camera was at his chest level, and being over 6 feet tall, "Sergeant Miller's eyes could see things the camera could not." (*Id.*) Defendants argue that "[w]hat can be seen, however, both through Sergeant Miller's eyes and in the BWC footage, is Plaintiff's hand sliding backwards over his right leg," and thus, "there is a trifecta of evidence beyond dispute that Plaintiff moved his right hand 'towards his crotch area,' where the gun was located, just before Sergeant Miller shot him." (*Id.*)

Although Defendants suggest that the body-worn camera footage is incomplete, the footage is the same footage Defendants filed as an exhibit in support of their Motion for Summary Judgment. (DSOF Ex. C.) And although Defendants take issue with Plaintiff's screenshots taken from the video, they have neither argued nor demonstrated that the video or screenshots are inauthentic or have been altered in any relevant way. As Defendants note, the Court can "see what can be seen" on the video, and Plaintiff's version of events is not "blatantly contradicted" by the video.

### E.  Discussion of Fourth Amendment Claim

Defendants contend that Sergeant Miller's use of force was objectively reasonable under the specific totality of the circumstances he was facing. (Doc. 55 at 6.)

#### 1.  Nature and Quality of Force

The gravity of the particular intrusion that a given use of force imposes upon an individual's liberty interest is measured with reference to "the type and amount of force inflicted." *Young*, 655 F.3d at 1161 (quoting *Deorle v. Rutherford*, 272 F.3d 1272, 1279 (9th Cir. 2001). Deadly force is permissible only "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11. "The intrusiveness of a seizure by means of deadly force is unmatched," *id.* at 9, and "implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'" *A.K.H.*, 837

F.3d at 1011 (quoting *Garner*, 471 U.S. at 9).

It is undisputed that Sergeant Miller shot Plaintiff in the face. The Ninth Circuit has recognized that "shooting a firearm" is "categorically" deadly force. *See Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (concluding that "shooting a firearm" is "categorically" deadly force). Thus, the governmental interests must be correspondingly weighty to justify the use of deadly force.

### 2.     Governmental Interests (*Graham* Factors)

#### a.     Severity of Crime

It is undisputed that Sergeant Miller initiated a traffic stop of Plaintiff's vehicle and observed Plaintiff in possession of drugs. There is no evidence that before Sergeant Miller stopped Plaintiff's vehicle, he had any reason to suspect Plaintiff had committed any other crime and there is no evidence that Plaintiff was suspected of having committed a violent crime. This factor weighs in favor of Plaintiff.

#### b.     Immediate Threat

The Ninth Circuit has recognized that whether a suspect poses an immediate threat is the most important *Graham* factor. *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). To show objective reasonableness, there must be "objective factors" to justify an officer's "fear[ ] for his safety or the safety of others." *Estate of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023) (quoting *Deorle*, 272 F.3d at 1281). "In other words, 'the objective facts must indicate that the suspect pose[d] an immediate threat to the officer or a member of the public.'" *Id.* (quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)). "This analysis is not static, and the reasonableness of force may change as the circumstances evolve." *Id.* (quoting *Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022)).

It is undisputed that a semiautomatic firearm was in Plaintiff's lap. The threat posed by an easily accessible semiautomatic weapon is unquestionably severe. There is a disputed issue of material fact as to whether Plaintiff reached toward the weapon. Because the Court construes the facts in Plaintiff's favor at summary judgment and must take as

true that Plaintiff did not reach toward the weapon, this factor weights in favor of Plaintiff.

### c. Resisting

Defendants argue that it is "undisputed that after being commanded to put his hands on the steering wheel, Plaintiff started to move his right hand 'towards his crotch area[,]'" which is the area where the gun was located. (Doc. 55 at 6.) But, as discussed above, less than five seconds elapsed between the *first* command Sergeant Miller gave and when Miller shot Plaintiff. The entire encounter before Sergeant Miller shot lasted less than 15 seconds. Viewing the facts in the light most favorable to Plaintiff, when Sergeant Miller commanded Plaintiff to put his hands on the steering wheel, Plaintiff was not holding the firearm, and he began to place hands on the steering wheel, but Miller shot Plainitiff in the face before Plaintiff could fully comply. Thus, the evidence indicates that Plaintiff did not have an opportunity to resist before Defendant Miller shot him. This factor weighs in favor of Plaintiff.

### 3. Necessity of Force Used

With respect to the reasonableness of lethal force in response to a threat, the Ninth Circuit has observed that "[a]t one end of the spectrum, when a suspect points a gun in an officer's direction, 'the Constitution undoubtedly entitles the officer to respond with deadly force.'" *Id.* at 620 (quoting *George*, 736 F.3d at 838). Thus, it is "well-settled that lethal force is justified if an officer has 'probable cause to believe that [a] suspect poses a significant threat of death or serious physical injury to the officer or others.'" *Id.* (quoting *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007)). But reasonableness does not "always require officers to delay their fire until a suspect turns their weapon on them." *Id.* (quoting *George*, 736 F.3d at 838). If the person is armed, "a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id.* (quoting *George*, 736 F.3d at 838).

In assessing whether a use of force is reasonable, courts "consider whether officers gave a warning before employing the force." *Glenn v. Washington Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011) (citing *Bryan*, 630 F.3d at 831 ("police officers normally provide . . .

warnings where feasible, even when the force is less than deadly, and . . . the failure to give such a warning is a factor to consider" in the overall use-of-force analysis)).

Here, viewing the evidence in the light most favorable to Plaintiff, Sergeant Miller directed Plaintiff to place his hands on the steering wheel but shot Plaintiff before he had a chance to comply. Sergeant Miller's "warning" is meaningless where Miller used force before Plaintiff had a chance to comply with the warning. *See A.K.H.*, 837 F.3d at 1012 (concluding that use of deadly force was unreasonable where officer "escalated to deadly force very quickly"). This factor weighs in favor of Plaintiff.

### 4. Balancing Governmental Interest Against Nature of Intrusion

The Court must determine whether the force Sergeant Miller used was reasonable by balancing "the gravity of the intrusion on the individual against the government's need for that intrusion." *Miller*, 340 F.3d at 964. Sergeant Miller's use of deadly force constituted an extreme intrusion on Plaintiff's liberty interests. *See A.K.H.*, 837 F.3d at 1011. Defendants cite *Estate of Strickland* to support their argument that it was reasonable for Sergeant Miller to assume that Plaintiff was reaching for the gun and to fear for his safety, and Plaintiff's intent and any mistake by Miller regarding Plaintiff's intent are irrelevant. (Doc. 74 at 3.)

In *Estate of Strickland*, officers responded to a report that the plaintiff was walking on a residential road with "what appeared to be a shotgun" slung over his shoulder. 69 F.4th at 618. The plaintiff was carrying a black, plastic airsoft rifle marked with an orange tip, which signified that it was a replica, not a real firearm. *Id.* The officers maneuvered their patrol vehicles around plaintiff and surrounded him with guns drawn. *Id.* They immediately began yelling at the plaintiff to "drop the gun!" and "drop the fucking gun!" The plaintiff told the officers it was a BB gun and slapped the gun with his hand, making a noise that sounded more like plastic than metal. *Id.* One of the officers reported to dispatch: "He's saying it's a BB gun." *Id.* The officers continued to yell commands to "drop the fucking gun, now" and told the plaintiff, "we don't know that's a fake gun." *Id.* The plaintiff pointed to the orange tip on the barrel, and one officer responded, "you could

- 11 -

have painted that . . . . We don't want to kill you." *Id.* The plaintiff replied, "I'm not doing nothing wrong." *Id.* Until then, the plaintiff stood with the barrel pointing at the ground. One officer asked the other officers to cover him and started approaching the plaintiff. *Id.* Two officers had their firearms drawn, and the third was armed with a taser. *Id.* As the officers approached, the plaintiff dropped down to his knees. *Id.* At this point, the plaintiff stopped pointing the BB gun at the ground and began pointing the BB gun in the direction of the officers and up toward the sky. *Id.* In response, an officer deployed the taser, but it failed to attach and disarm the plaintiff. *Id.* Seconds later, after the plaintiff lowered the barrel toward the officers, the officers opened fire, striking the plaintiff several times. *Id.*

The Ninth Circuit observed that most of the *Graham* factors favored the plaintiff, but concluded the immediacy of the threat the plaintiff posed outweighed those considerations. *Id.* at 620. "When an officer's 'use of force is based on a mistake of fact, we ask whether a reasonable officer would have or *should* have accurately perceived that fact.'" *Id.* (quoting *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011).

Here, although Plaintiff possessed and had ready access to a semiautomatic firearm, unlike the plaintiff in *Estate of Strickland*, it is undisputed that the firearm was not in his hand, Plaintiff never picked it up or brandished it, and he never made a verbal threat to Sergeant Miller. Viewing the evidence in the light most favorable to Plaintiff, Sergeant Miller did not allow Plaintiff a chance to comply with a warning before Miller shot Plaintiff. On balance, a reasonable jury could conclude that the force Sergeant Miller used was unreasonable in the circumstances. Thus, there is a genuine dispute of material fact regarding whether Sergeant Miller used excessive force against Plaintiff in violation of the Fourth Amendment. The Court will therefore consider whether Sergeant Miller is entitled to qualified immunity.

### F.   Qualified Immunity

#### 1.   Legal Standard

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Thus, "the contours of the right must be sufficiently clear that at the time the allegedly unlawful act is [under]taken, a reasonable official would understand that what he is doing violates that right;" and "in the light of pre-existing law the unlawfulness must be apparent." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quotations omitted). Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

**2.    Discussion**

To determine whether Sergeant Miller violated clearly established law, the Court looks to "cases relevant to the situation [Miller] confronted," *Brosseau v. Haugen*, 543 U.S. 194, 200 (2004) (quotation marks omitted), but there need not be a case "directly on point." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

It was clearly established in 2019 that shooting a non-resisting, non-fleeing suspect before the suspect has a chance to comply with an officer's warning constituted excessive force under the Fourth Amendment. *See Garner*, 471 U.S. at 4; *A.K.H.*, 837 F.3d at 1011. In *A.K.H.*, the officer drove up beside the plaintiff's vehicle, immediately commanded the

plaintiff to take his hand out of his pocket, and shot the plaintiff just as he was taking his hand out of his pocket. 873 F.3d at 1012. Less than a second elapsed between the time the officer commanded the plaintiff to take his hand from his pocket and the officer shooting him. *Id.* In this case, the body-worn camera footage captured less than four minutes, and only about 5 seconds elapsed between the first time Sergeant Miller commanded Plaintiff to put his hands on the steering wheel and the time Miller shot Plaintiff in the face. The facts of this case are indistinguishable from the facts in *A.K.H.*[1] Thus, the Court concludes Sergeant Miller is not entitled to qualified immunity.

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment as to Counts Two through Four and as to Defendants City of Peoria and Arthur Miller. The Court will deny Defendant's Motion to as to Count Five and Matthew Miller.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants' Motion to Exclude (Doc. 54) and Motion for Summary Judgment (Doc. 55).

(2) Defendants' Motion to Exclude (Doc. 54) is **denied without prejudice**.

(3) Defendants' Motion for Summary Judgment (Doc. 55) is **granted** in part and **denied** in part. The Motion is **granted** as to Counts Two through Four and Defendants City of Peoria and Arthur Miller. The Motion is **denied** as to Count Five and Defendant Matthew Miller.

(4) Counts Two through Four are **dismissed**.

(5) Defendants City of Peoria and Arthur Miller are **dismissed**.

(6) The remaining claim is the Fourth Amendment claim in Count Five against Defendant Matthew Miller.

(7) This action is referred by random lot to Magistrate Judge Deborah M. Fine for the purpose of conducting a settlement conference.

---

[1] In concluding that the officer was not entitled to qualified immunity, the Ninth Circuit in *A.K.H.* cited *Garner* as "clearly established law" that applied to the case. *Id.* at 1013. In *Garner*, police suspected the plaintiff of burglary, the plaintiff fled from police although an officer had told him to "halt," and the officer stated that the suspect "appeared to be unarmed" but that he "could not be certain that was the case." 471 U.S. at 4, 20.

(8) Counsel must jointly contact the chambers of Magistrate Judge Fine at 602-322-7630 within **14 days** of the date of this Order to schedule a settlement conference.

Dated this 5th day of September, 2023.

Honorable Roslyn O. Silver
Senior United States District Judge